RECEIVED

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

09 DEC 22 PM 4:29

CLERK, U.S. DIST. COURT
ST. PAUL, MN

Elias A. Murdock,
In forma pauperis

        Plaintiff,

v.

Ramsey County Community Corrections Department,
Ramsey County Revenue Recapture Program,
Tim Carey, a Probation/Parole Officer,
Maureen Munson, a Probation/Parole Officer,
Matt Nelson, a Probation/Parole Officer,
Jason Rudolph, Supervisor of Probation Officers,
Carol Bauman, Director of Probation Officers,
Ramsey County District Court, Criminal Division,
Project Pathfinder
Minnesota Department of Human Rights,
Velma Korbel, Commissioner,
Minnesota Department of Employment and Economic Development,
Governor Tim Pawlenty,
City of St. Paul, Department of Public Safety,
Barb McMonigal, an Inspector,
Jeffrey Fischbach, a Supervisor,
Christine Rozek, Deputy Director,
City of St. Paul, Police Department, All divisions
City of St. Paul, Department of Public Works,
City of St. Paul, Mayor Chris Coleman
City of St. Paul, City Council, All members,
City of St. Paul Attorneys,
John Penland, Assistant Attorney,
Steven Heng, Assistant Attorney, Rosa Hernandez, Individual
St. Paul Pioneer Press,
Emily Gurnon, a writer,
Jason Hoppin, a writer,
YWCA St. Paul, Tamara Burch, YWCA Minneapolis,
YMCA Twin Cities, (All Defendants as individuals)

Court File No. 09. 3679 MJD/JJG

**COMPLAINT AND**
**REQUEST FOR A JURY**
**TRIAL**

SCANNED

DEC 2 2 2009

U.S. DISTRICT COURT ST. PAUL

1

## JURISDICTION AND VENUE

1.     Pursuant to Fed. R. Civ. P. 38(b) NOW COMES a complaint against the forthcoming Defendants set forth herein. This action is brought for violations of Title VII 1964 Civil Rights Act, the U.S. Constitution, and related Amendments, The Minnesota Human Rights Act 363A. et seq., and other common law, doctrines and statutes. Jurisdiction is vested in this court by virtue of 28 USC 1331.

2.     Plaintiffs' claims brought under Minnesota law are so related to their federal claims, of which the Court has original jurisdiction, that they form part of the same case or controversy. Under Article III of the United States Constitution, the Court has jurisdiction over Plaintiffs' Minnesota common law and statutory claims pursuant to 28 USC 1367.

3.     Jurisdiction is also conferred on this Court by 42 USC 2000e-5.

4.     Equitable and further relief is also sought under 42 USC 2000e-3(a) et. seq., 2000e-5(g) and RICO Act, 18 USCA 1950, 1961-1968. matter comes before the Honorable Judges of the U.S. District Court.

5.     Due to multiple conflict of interest relationships discovered within Ramsey County District Court, the City of St. Paul, and the state, Plaintiff seeks relief in Federal Court for this matter.

Additionally, this complaint includes the MDHR, an agency responsible for processing charges of discrimination. MDEED, an agency responsible for providing unemployment insurance for Minnesota residents and alike. The Plaintiff requests a waiver of the Right of Suit normally obtained, as this complaint alleges a violation of the integrity of the work sharing agreement between the MDHR and the EEOC.

6.    Plaintiff seeks relief from actions by local city and state agency officials that have blatantly disregarded his valid, ongoing, substantiated complaints, and have violated his civil rights.

### PARTIES "PLAINTIFF"

7.    Mr. Elias A. Murdock, hereinafter, ("Plaintiff" or "Mr. Murdock" or "Murdock"), a Native American Indian registered with a federally recognized tribe, who resides in Ramsey County at 704 W. Maryland Avenue, St. Paul, MN 55117-4128.

### PARTIES "DEFENDANTS"

8.  Ramsey County Community Corrections Department, Revenue Recapture Department, Ramsey County District Court, Criminal Division: Tim Carey, Jason Rudolph, Maureen Munson, Matt Nelson and Carol Bauman, known to conduct business or work at Adult Courts Division, Spruce Tree Centre, West 1600 University Avenue, Suite 410, St. Paul, MN

55104, or 15 W. Kellogg Blvd. St. Paul, MN 55102.

9. Minnesota Department of Human Rights, Velma Korbel, Janet Lee, Lisa Ybarra. 190 E. 5th St. Su. 700, Sibley Plaza at Mears Park, St. Paul, MN 55102. Minnesota Department of Employment and Economic Development.

10. City of St. Paul Department of Public Safety, Barbara McMonigal, Jeffrey Fischbach, Christine Rozek, 25 W. Fourth St. St. Paul, MN 55102.

11. City of St. Paul City Council Members, Kathy Lantry, Lee Helgen, Melvin Carter III, All other Members. Capitol Blvd. City Hall.

12. City of St. Paul attorneys, John T. Penland, and Steven Heng, Room 600 15 W. Kellogg Blvd. St. Paul, MN 55102.

13. St. Paul Pioneer Press, Emily Gurnon, Jason Hoppin, Shannon Prather, 345 Cedar St. St. Paul, MN 55101.

St. Paul Police Department in its entirety, Western and all divisons.

YWCA St. Paul and Minneapolis Twin Cities.

14. In August 2003, Plaintiff was terminated from a Health and Fitness Director position he held within the YMCA Minneapolis ("YMCA"). His supervisor, Cassie Rood ("Rood") alleged the reason for his termination was that he failed to maintain his national certification.

However, it is known that Rood made a substantial error during a Fitness Audit, and blamed the Plaintiff for it. Additionally, the Plaintiff alleged that he was fired because Rood was promoting an openly gay, lesbian female to assume his duties, and promoting the gay rights agenda within his workplace.

16.     The promotion of a gay rights agenda was a frequent complaint posted by members at the Downtown Minneapolis YMCA location.

17.     The Plaintiff filed a charge of discrimination with the Minnesota Department of Human Rights ("MDHR") against Rood and the YMCA Minneapolis. The charge was processed slowly, taking months for an enforcement officer to respond. The Plaintiff received a phone call from the MDHR asking he wanted to continue pursuing the charge. He replied, "Yes, that's the reason I filed it. I would like to continue pursuing it."

18.     Subsequently, the Plaintiff was brought in to a room by an Administrative Staff Member at the Downtown YMCA and asked if he would like to settle the matter, and withdraw his charge of discrimination. He refused this offer, and requested the charge process to continue.

19.     Due to ongoing delays in investigating the charge, the Plaintiff withdrew his charge of discrimination from the MDHR.

20.     Successively, on May 17, 2006 Plaintiff contacted the

MDHR to file a charge of discrimination based on gender, race, religion and reverse sexual orientation against his employer at the time, YWCA St. Paul.

21.   On June 7, 2006 Plaintiff sent the formal charge of discrimination questionnaire form in to the MDHR. Although the form was received at the MDHR on June 8th, the charge was delayed in processing five weeks after it was received. This caused the 300-day EEOC deadline to expire. As such, Plaintiff lost his right for an EEOC review of his case.

22.   On July 12, 2006, the Plaintiff had contacted the Defendant enforcement officer Janet Lee several times prior to inquire about the status of his charge summary. On several occasions, Lee told him that she would contact him by telephone and e-mail, but failed in this capacity.

23.   On July 19, 20 and 21, 2006 the Plaintiff went directly to the MDHR to get the charge summary completed. In the MDHR lobby, Lee stated, "I'll finish it by noon, but if I don't I'll let you know." and "I'm overwhelmed with complaints." Lee made the statement, "You men…" and then laughed while she walked by the Plaintiff and two of his co-workers to go out for a break. She was to have completed the charge summary by noon.

24.   Subsequently, Supervisor, David Castledine completed the summary on that same day, and rushed it out to the Plaintiff and his co-workers.

25.     Throughout the years of 2006-2008, the Plaintiff wrote several personal letters to Defendant Velma Korbel ("Korbel") MDHR Commissioner, stating that her enforcement officers were willfully delaying the charge, and staff and her made numerous errors in case facts. The Plaintiff also sent a letter to Mayor Chris Coleman ("Coleman") stating that a City Council Representative had failed to take action on complaints from citizens in the community and members alike. Coleman did not respond. It is also known that  Coleman and the City of St. Paul ("CSTP") consistently eliminate financial, program funding for minorities without viable reasons.

26.     Likewise, a 2007 letter was sent to Defendant Governor Tim Pawlenty ("Pawlenty"), citing actions of the MDHR to be biased, and supporting the YWCA without evidence.

26a.   Subsequently, in 2009, Plaintiff complained to the Attorney General's office that he was charged interest on a YWCA St. Paul, non-fraudulent, unemployment account by the Minnesota Department of Employment and Economic Development ("MDEED"). To date, the AG's office or MDEED has taken no action to admit this error.

27.    Plaintiff never received a direct reply from Korbel, but instead received one response letter from Pawlenty that completely ignored his

complaint about the MDHR's support of the YWCA St. Paul without evidence.

28.   Subsequently, a 2009 letter from the Minnesota Office of Attorney General stated that the MDHR was under the direct jurisdiction of Korbel and Pawlenty, and that such complaints should be directed to them.

29.   On July 28, 2006 Plaintiff filed a formal charge of discrimination with the MDHR.

30.   At such time, Deborah Montgomery,  ("Montgomery"), YWCA St. Paul Board President, was also a St. Paul City Council Representative, Ward 1. She was not re-elected to her council position, but is known to still hold the board president position at the YWCA St. Paul. Montgomery also served as City of St. Paul Police Officer.

31.   In 2007, the Honorable Judge Donovan Frank court ordered files from the MDHR regarding the Plaintiff's evidence. In approximately October 2007, the Plaintiff received MDHR files containing a letter written by Lee that was never mailed to him. This letter was dated July 21, 2006. The MDHR file evidence suggests Lee's letter was falsely dated.

32.   At or approximately the same period, July 2006, Plaintiff also applied for a Therapeutic Massage Practitioner License in the City of St. Paul License and Environmental Protection ("LIEP") agency. Defendant

Barb McMonigal, ("McMonigal") inspector for said agency, denied licensure to the Plaintiff on the basis that he failed to meet certain criteria.

33.   However, the Plaintiff had submitted all the appropriate paperwork in accordance with LIEP criteria, with a new 2007 application.

34.   In December of 2006, McMonigal spoke to the Plaintiff in a phone conversation, telling him, "Well, looks like all your paperwork is here and in order. Oh, well, would you look at this, your insurance is coming due in two months.  That kind of red flags it. Are you going to pay up on your insurance? Would you like me to send your application back to you?"

35.   On December 29, 2006, McMonigal sent the entire, 2006 *original* application, along with its associated documents back to the Plaintiff.

36.   In the Plaintiff's previous civil case during the discovery pre-trial period, the YWCA St. Paul failed to answer interrogatories concerning conflict of interest relationships with City of St. Paul agencies and officials.

37.   In March 2008, Plaintiff received a letter from Defendant Jeffrey Fischbach citing that the same 2006 application was *still pending* even though it was returned to the Plaintiff in December 2006. Fishbach also stated that the Plaintiff could request a refund of his application fee of $83.00 by contacting Defendant Rozek. Plaintiff received a $62.00 refund

with no explanation of the $21.00 discrepancy.

38.     In August 2008, Plaintiff's 2007 Therapeutic Massage Practitioner License was brought before the St. Paul City Council ("SPCC") for a vote. All members voted "NAY" and denied the application for licensure, and barred the Plaintiff permanently from obtaining licensure in St. Paul.

39.     Fischbach and Rozek failed to provide due notice of this pending vote. Additionally, they notified the Plaintiff of the wrong application.

40.     In March 2009, Plaintiff wrote a demand letter for his 2007 refund of his application fee and requested his *original* application. He sent a copy of this letter to the Minnesota Office of Attorney General.

41.     On April 3, 2009, Plaintiff received a letter from Lori Swanson, Attorney General, stating that staff from her office contacted Rozek, and the City of St. Paul ("CSTP") agreed to refund his fee. Swanson also enclosed a Guide to Conciliation Court with her letter.

42.     On May 22, 2009, Plaintiff received a full refund of $83.00 from Rozek.

43.     On October 19, 2009, Plaintiff and Rozek met in Conciliation Court after her department refused to respond to a demand letter for the

original 2007 application, and a $21.00 discrepancy on his 2006 fee refund.

44.    Judgment in Plaintiff's favor was awarded entitling him to $96.00 including court fees. He has since received payment. Notably, the first referee assigned to hear his conciliation case had a conflict of interest relationship with Rozek. Plaintiff requested an alternate referee.

45.    In March 2008, St. Paul Attorneys John Penland and Steven Heng worked collaboratively on a criminal court matter involving the Plaintiff. The City Attorneys failed to ascertain that Rosa Hernandez, ("Hernandez") the complainant they were representing was a member of the YWCA St. Paul.

46.    The Plaintiff had a discrimination lawsuit pending against YWCA St. Paul in U.S. District Court *(See Murdock v. YWCA St. Paul 07-3240 DWF/SRN)* and argued that there were multiple "conflict of interest" relationships being discovered through his case. He cited that Hernandez was retaliating against him for a "sour" relationship by divulging key information about him to their staff to damage his federal court case.

47.    The Plaintiff had previously discovered that Tyrone Terrill, Director of St. Paul Department of Human Rights ("SPDHR") at the time, had a conflict of interest relationship with the YWCA St. Paul. Plaintiff filed a complaint with the U.S. Department of Justice in September 2008

requesting the investigation of the MDHR and other agencies to determine

any other conflict of interest relationships. Ramsey County attorneys,

judges, probation officers and other officials refused to listen, balked at

the Plaintiff, and dismissed it as merely his "conspiracy theory."

48.     Plaintiff also argued that Hernandez was not likewise licensed

by the City of St. Paul to operate a Massage Therapy or Chiropractic

business at her residence. Furthermore, Hernandez had a sexual relationship

with the Chiropractor, her ex-boyfriend who would come over regularly to

provide her with "treatments", and should be subject to similar prosecution.

49.     On May 21, 2008, Defendant Emily Gurnon wrote an article in

the St. Paul Pioneer Press ("SPPP") concerning the allegations and charges

pending against the Plaintiff in Ramsey County District Court. Gurnon failed

to make any direct contact with the Plaintiff to verify that the allegations

were truthful, and wrote an article containing unsubstantiated facts to the

public.

50.     Gurnon's article concerning the pending charges was printed in

the top section, and middle pages of the Local Northern Suburbs section.

51.     As a result, the search engines Google or Yahoo now direct

individuals to a link or website with the article. Gurnon's article can easily

be seen and read by citizens and thereby, prospective jurors.

51.    An extremely high percentage of Gurnon's articles concern

male suspects who have been charged with, or convicted of offenses.

As such, her reporting appears rather imbalanced and gender biased. Her

actions are evident in her frequent coverage of such matters.

52.    In April 2009, following his sentencing hearing, a *hard copy* of

Gurnon's article was sent by an unknown source to the Plaintiff's employer

out-of-state. In December 2008, Plaintiff participated in a deposition given

by the YWCA St. Paul, and Tamara Burch ("Burch"), his former supervisor,

was present. During the deposition, the Plaintiff divulged his current

employer's address information to the attorney. Burch had access to his

address information.

53.    In 2009, the Plaintiff sent an e-mail to the attorney, and Gurnon

inquiring if they knew how this article was sent to his employer in *hard*

*copy* form. Gurnon replied in an e-mail, "Maybe they read the paper."

54.    In September 2008, Plaintiff read a SPPP article written by

Defendant Jason Hoppin stating that Tyrone Terrill, then Director

of the St. Paul Department of Human Rights was resigning his position, and

that Mayor Chris Coleman would appoint an interim director.

55.    Plaintiff called Hoppin, and asked why Terrill was resigning.

Hoppin replied, "...something about him not processing charges of

discrimination fast enough." Plaintiff stated that he had a pending Jury Trial against the YWCA St. Paul, and that he received a "Conflict of Interest" letter from Terrill, stating he could not investigate the charge because of his relationship with the Executive Director and several board members.

56.    When the Plaintiff asked if Hoppin would write an article concerning his YWCA St. Paul Civil Case matter, Hoppin replied, "What did he [Terrill] do wrong?" Hoppin refused to print any article regarding the YWCA St. Paul, or Coleman, and implied that there should be a wrongdoing committed.

57.    Likewise, SPPP Shannon Prather ("Prather") refused to print any article concerning the Plaintiff's civil case and EEOC investigation.

58.    On March 2, 2009, Plaintiff participated in a Pre-Sentencing Interview with Defendant, Tim Carey. Prior to this, Plaintiff had also participated in a Pre-Sentencing Interview with Defendant Maureen Munson.

59.    During his March 2, 2009 interview, Carey harassed the Plaintiff by falsely accusing him of referring to Hernandez, as a "slut", saying, "Now that you called her a slut and said that she was easy, let's move on..." Carey further harassed him by fabricating non-standard questions that were not protocol on the Corrections Questionnaire Form.

60.   Carey asked multiple non-protocol questions such as, "Are you a face, boob or ass man!" "Which one, huh, which one…answer the question!" He asked where the Plaintiff attended church, and then scoffed at his religious affiliation. Carey further advised the Plaintiff by stating that he should "…seek out personal relationships for the purpose of sexual release." Carey scoffed at the Plaintiff's claim of being in U.S. Bankruptcy Court against his former employer, Bally Total Fitness, MN, and dismissed it as untruthful, saying, "Big whoop dee doo, it's just a claim form."

61.   Additionally, Carey yelled at the Plaintiff stating, "You're just like all the other criminals…you lost your rights when you walked through that door!"

62.   Furthermore, Carey asked conflicting questions during the interview such as, "When did you begin dating Ms. Hernandez?" confusing it with "When did you meet Ms. Hernandez?" Carey concluded by stating, "We are sexual beings, and we need sexual release."

63.   Plaintiff was aghast at Carey's conduct, and immediately corrected him for making such lewd and lewcivious remarks concerning his personal life, religious beliefs, and falsely accusing him of making derogatory remarks Hernandez.

64.    In March 2009 the Plaintiff filed a complaint against Carey.

65.    Defendant Jason Rudolph, ("Rudolph") his supervisor, admitted that Carey came in to his office <u>after</u> the interview and asked if using the word "slut" in his interrogation was appropriate. Rudolph stated that it was okay and instructed him to leave it in the P.S.I. report.

66.    Additionally, Rudolph failed to address several other concerns and failed to address the core issues in the complaint of Carey's conduct.

66.    In February 2009, Plaintiff pled guilty to a misdemeanor and the scope of the state statute does not properly jibe with nature of the incident. He pled guilty because he was denied legal representation due to his financial situation. He repeatedly requested legal representation, and the Court denied it.

68.    Furthermore, the judge(s) instructed him to retain an attorney that cost $500 dollars. Yet, this amount was nearly one half of his monthly income at the time. The Plaintiff replied that he was suffering from financial hardship and emotional distress from losing several jobs to employment discrimination, and that his federal case was still pending.

69.    Additionally, the Plaintiff's mother was ill, and dying in a nursing home. Both his grandparents died in 2007. His uncle was ill

with cancer, and his father's health was in jeopardy. His home was also in foreclosure. The Plaintiff was *Pro-Se,* and believed he would lose his criminal case in a jury trial.

70.     In February 2009, Judge John H. Guthman stated, "We all know if we go to trial what the decision is going to be." Guthman had apparently decided the verdict well in advance of a jury trial.

71.     On March 10, 2009, Guthman also stated that the Plaintiff had a "bartering arrangement" with Hernandez. This statement contradicted and refuted case facts presented by the attorneys. CSTP attorney Penland also placed an unrelated, 1994 offense on record. The records for the 1994 offense were sealed in Court by Judge Gregg E. Johnson.

72.     In September 2009, the Ramsey County Corrections Revenue Recapture Department ("RCCRRD") recaptured $300.00, plus a $15.00 service charge of the Plaintiff's Property Tax return of $902.00.

73.     The paperwork from the Ramsey County District Court specifies that the Plaintiff has one year from sentencing to pay off this probation debt. This would allow up until March 2010 to pay off his debt with no $15.00 fee.

74.     In October 2009, Plaintiff's 2008 Property Assessment Right of Way Maintenance Payments were returned by Louise Langberg

("Langberg") City of St. Paul Department of Public Works ("CSPDPW").

Langberg stated that his payments were late, would not be accepted and

would be forwarded for collection on his 2009 Property Taxes. Plaintiff

wrote a reply letter to Langberg stating that the payments were delayed due

to the PO Box being closed by the City and Post Office, he was not

at fault, and would be charged interest on the amounts. Plaintiff had spoke to

a CSTP employee and learned that multiple CSTP citizens complained when

their payments were returned without any explanation.

75.     In October 2009, MDHR and Ramsey Court web sites revealed

relevant, conflict of interest information. The Plaintiff discovered that

MDHR Commissioner Korbel, and Ramsey County Chief Judge Kathleen

Gearin both have a past or present relationship with YMCA's and the

YWCA's of the Twin Cities area. These conflicts of interest relationships

were not divulged during the MDHR's process of investigation, or during

Ramsey Court proceedings. Furthermore, Judge Guthman was frequently 45

minutes to one hour late to bench times.

76.     In some cases, discovery of these facts could not have been

affected until January 2009.

77.     In October 2009 Plaintiff witnessed multiple incidents of St.

Paul Police ("SPPD") cars driving in and around his residential area,

flashing their lights only when they drove by his residence, and maintaining surveillance of his residence at various times day and night. Current and pending lawsuits filed by SPPD officers allege retaliation by the Police Chief, John Harrington ("Harrington"). The lawsuits also allege tolerance of racially biased actions, sexual harassment, retaliation for not voting for him, and secret discipline of officers within the department.

78.   On October 26, 2009, Plaintiff went in for a mandatory probation meeting with his parole officer Matt Nelson ("Nelson"). At such time, he was told that Nelson was not in, and that instead, he should fill out a "Formal Report" Form.

79.   The Formal Report asked questions such as, "Do you have access to a computer and internet at home or at work?" "Rate how you feel on a scale from 1-10 Really Bad or Really Good." "Are you making more money now"

80.   On Monday November 23, 2009, Plaintiff met with probation officer Nelson.

81.   Nelson accused the Plaintiff of being upset and angry even though the Plaintiff did not raise his voice, or make any statements of an angry nature. However, Nelson made no mention of the Formal Report Form.

82.   Nelson further informed the Plaintiff that he violated his probation for delaying meetings with him, and his probation would be extended.

83.   The Plaintiff stated, "I believe several deaths in the family may qualify as a viable reason. You've also scheduled meetings during times when I told you I work."

84.   Nelson called the next day informing the Plaintiff he was to appear in Court on January 12, 2010. This date is one year from his settlement conference with the YWCA St. Paul.

85.   On December 6, 2009, Plaintiff received his $96.00 payment for judgment in his favor in Ramsey County Conciliation Court against the City of St. Paul Department of Safety and Inspections.

86.   On Monday December 14, 2009, Plaintiff was contacted by a Project Pathfinder employee stating that his appointment to get psychological testing needed to be rescheduled. The employee gave no reason, and sent a letter of the same.

87.   Rescheduling of the Plaintiff's appointment causes a direct delay in fulfilling his probation requirements. The Plaintiff was not at fault for this rescheduling of his testing.

87.   The Defendants acted with malice and reckless indifference to

the Plaintiff's rights, and as such violated his civil and human rights.

88.    All statements are hereby reaffirmed.


## DAMAGES

## COUNT I

## GENDER, RACIAL, RELIGIOUS, REVERSE SEXUAL ORIENTATION DISCRIMINATION AND RETALIATION TITLE VII 1964 CIVIL RIGHTS ACT; MINN. HUMAN RIGHTS ACT 363A ET. SEQ.

88.    Defendants action rise up to a violation of settlement agreement, unlawful racial, gender, reverse sexual orientation and retaliation within the scope of City, County and local government, and as such, violated Plaintiffs' rights to employment or equal access to employment in the City and County.

89.    Plaintiff is an American Indian, heterosexual, male, registered with a federally recognized tribe, and as such, affords protected status.

90.    In lieu of the Metro Gang Strike Force actions against minorities, Plaintiff's claims of racial discrimination and retaliation hold water against the city, county and state as a whole. Defendants' verbal, racial and gender statements, hiring of white only,  and openly gay, females, animosity and malice against the Plaintiff and citizens and minorities alike, in the scope of city and county local government is a severe violation of protected rights.

21

91.   As a direct and proximate result of the Defendants' actions, Plaintiff has suffered, and will continue to suffer the humiliation of discriminatory actions. Damages sustained are in an amount in excess of: $100,000.00

## COUNT II

### LOST WAGES

91.   Defendant obstructed licensure of the Plaintiff and denied him the ability to work in his community in a part-time, profession. As such Plaintiff incurred severe loss of living wages and associated debts from school loans, creditors, and his mortgage lender.

92.   As a direct and proximate result of the Defendants' actions, Plaintiff suffered the forthcoming financial damages:

Part-time Massage Therapist     $25,000.00/ year x 3 years = $75,000.

### OUTSTANDING DEBTS

(One hundred twelve thousand five hundred     $115,000.00
thirty five)

### INVESTMENTS AND PERSONAL LOSS

Lost retirement and personal funds         $ 20,000.00
Personal borrowed loans                    $ 40,000.00
                                           $ 60,000.00

### COSTS AND FEES

Copies, postage,                           $  1,700.00

93. Additionally, Plaintiffs' loss of free time harmed him by not allowing time off for caring for his mother whose health was severely declining in a nursing home. His mother suffered due to less interaction with him. She died in March 2009.

94. Plaintiff has sustained the death of both his grandparents, his and his uncle. He has now assumed Guardian duties for his father, whose health is deteriorating.

95. Plaintiff has lost wage and retirement benefits afforded by a part-time position in his professions, and the possibility of advancement within the scope of that employment. Plaintiff has suffered damage in an amount in excess of: $75,000.00.

## COUNT III
## EMOTIONAL DISTRESS

96. Defendants' intentional actions to inflict emotional distress on the Plaintiff were evident and blatantly demonstrated. As such, Plaintiff suffers from symptoms of depression and anxiety resulting from a severe loss of enjoyment of life.

97. Plaintiff has lost quality of life and work, suffered from stressed relationships with friends and family, co-workers, and the surrounding community including financial institutions.

98.     Plaintiff suffered humiliation in his daily life due to financial problems and crises incurred from these actions, and has sought mental health therapy to cope with his situation. He suffers and will continue to suffer a garden variety of emotional and financial problems arising from Defendants' actions in an amount in excess of: $50,000.00

## COUNT IV

## DEFAMATION

99.     Defendant knowingly and purposely sent defamatory verbal and written communications regarding the Plaintiffs' charges, personal and professional life to parties both within and outside the Twin Cities area.

100.   As such, Plaintiff was harmed by loss of reputation and character, and has become unemployable in a part-time profession by local businesses. Defendants' actions of making false statements of Plaintiffs' conduct at local food co-ops, restaurants and coffee shops within the surrounding community, and his current employer caused harm to his character and reputation. As such, Defendant is liable for damages in excess of: $50,000.00.

## COUNT V

## NEGLIGENCE AND NEGLIGENT SUPERVISION

1. Duty  2. Breach of Duty  3. Causation  4. Injury

101. The Defendants' supervisors and government officials owed the Plaintiff a duty of supervising its managers, agents and staff, and appropriately investigating complaints and related matters. Defendant failed in this capacity, and as such, Plaintiff was harmed by Breach of Duty and Executive Breach of Duty by the Governor and Mayor.

102. Defendant is liable under the Doctrine of Respondeat Superior, and the State of Minnesota and City of St. Paul and Ramsey County are liable for actions of their employees and agents.

103. Plaintiff has suffered and will continue to suffer long term effects associated with this matter including but not limited to: Poor credit history, overdue bills and other costs associated with loss of income.

Defendant owes Plaintiff damages in excess of $50,000.00.

## COUNT VI

## HARRASSMENT

104. Defendants' officers harassed the Plainitff by scoffing him with remarks of his person, and abuse of power.

105. Additionally, tracking him with survelliance at all hours of the day. Defendants' conduct during the time of this case matter is and has been retaliatory and intimidating.

106. Plaintiff has been harassed by a probation officer, and St. Paul

Police Officers who have driven by his residence flashing their lights and abruptly moving from parked positions on Alameda, a cross-street in front of his residence, and from a local Speedy Market on Dale Street and Como Avenue all the way to in front of the his residence where they suddenly turn off their lights.

107.   Additionally, city officials harass him by disallowing the transactions of paying his residential property maintenance fees. In effect, making life difficult for the Plaintiff. Damages incurred are in an amount in excess of 50,000.

## COUNT VII

## RETALIATION

108.   Defendant retaliated against Plaintiff for filing complaints and suit against a City Official and former police officer, and agents of its local government. Additionally, city officials and their respective agents demonstrated retaliation.

109.   As such, Plaintiff suffered and will continue to suffer a garden variety of disorders from retaliatory actions within the scope of his daily living. The adverse effects of retaliating against him publicly and his relationships with members of the community are ongoing, and may never be remedied. Plaintiff was harmed in an amount in excess of $50,000.

## COUNT VIII

## OBSTRUCTION OF DUE PROCESS

110.   The Defendant obstructed obtainment of licensure within the

City of St. Paul, and other, routine transactions. As such, the Plaintiff has

been harmed by loss of money in correcting blatant errors, paying costly

interest or unnecessary fees and publicly documented in City Council

Meeting Minutes, and will continue to encounter extreme opposition to

obtaining any license in the City of St. Paul for any matters.

Plaintiff has been harmed in an amount in excess of: $50,000.

## COUNT VIIII
## EXTORTION/ENTRAPMENT

111.   The Defendant extorted fees and attempted to obtain by other

means personal and private information not normally required by law.  As

such, in addition to an invasion of privacy, Defendant also violated his right

to due process and review of such documents or matters relating these

actions.

112.   Defendant engaged in entrapment by willfully failing to notify

the Plaintiff of pending matters concerning his license being brought before

the City Council. As such, Defendant knowingly engaged in entrapment,

damaged the Plaintiff's reputation before the public.

113.   Plaintiff has suffered and will continue to suffer a garden

variety of emotional and physical distress. Plaintiff has suffered damages in an amount in excess of $50,000.

## COUNT X
## FRAUD

114.   Defendant MDHR knowingly engaged in Fraud by misrepresentation of procedural policies and processes.

115.   As such, willfully attempted to conceal such matters from the Court and the Plaintiff by forging false document(s) of the same so as to appear there was no error on its part.

116.   Defendant YWCA knowingly engaged in fraud by falsely stating revenue amounts for the periods concerning his tenure. As such, the Plaintiff was harmed by errors in case facts, concealment of errors, obstruction of process, and willful acts of misconduct. Damages are in excess of $50,000.

## PRAYER FOR RELIEF

WHEREOF, the Plaintiff prays for the following forms of relief:

A.   Court grant relief for all the matters complained of herein.
     Court grant relief by assigning Plaintiff an attorney.

B.   That the practices of Defendants' complained of herein be
     adjudged, decreed and declared violative of the rights secured

to the Plaintiff by the First Amendment, and other applicable Amendments of the Constitution of the United States, RICO Act, Title VII, 42 USC 2000, Minnesota Statute 363A.01 et seq., and Common Law.

C. That a permanent, mandatory injunction be issued requiring that Defendant adopt practices in conformity with the requirements of the Constitution of the United States, 42 USC 2000, Minnesota Statute 363A.01 et. seq. and Common Law, and all common law, torts, and ordinances.

D. That a permanent prohibitory injunction be issued prohibiting Defendant from engaging in the practices complained of herein.

E. For an entry of an Order prohibiting Defendants from solicitation, harassment, or any similar form of contact with the Plaintiff.

F. That the Court retain jurisdiction until such time as the Court is satisfied that Defendants' have remedied the practices complained of herein and are determined to be in full compliance with the law.

G. That the Court order Defendants to pay Plaintiff his reasonable costs and expenses associated with this action.

H.     That Plaintiff be awarded such other and further legal and

equitable relief as may be found appropriate, just and/or

equitable, including all damages.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues triable of rights

by jury.

Dated: December 22, 2009          Signed: _Elias A. Murdock_

Elias A. Murdock
704 W. Maryland Ave.
St. Paul, MN 55117-4128
(651) 488-6589
elifitint@juno.com

**PLAINTIFF PRO-SE**
Informa Pauperis